**J. Nat MOORE, Jr., d/b/a J. Nat Moore & Son**

v.

**NEW AMSTERDAM CASUALTY INSURANCE COMPANY**, Continental Insurance Company, Federal Insurance Company, Jack Norman Creswell, d/b/a Underwriters at Lloyd's, London Transit Casualty Company.

Civ. A. No. 3578.

United States District Court
E. D. Tennessee, S. D.
Sept. 22, 1961.

King & Fuston, Chattanooga, Tenn., for plaintiffs.

Percy Brown, Jr., Ogden, Brown, Robertson & Marshall, Louisville, Ky., for New Amsterdam Casualty Ins. Co., Continental Ins. Co. and Federal Ins. Co.

Roberts & Weill, Chattanooga, Tenn., for Underwriters at Lloyds.

Denney, Leftwich & Osborn, Nashville, Tenn., for Transit Casualty Co.

Duggan & Washington, Athens, Tenn., for Belknap Hdwe. & Mfg. Co.

DARR, District Judge.

For a number of years Mr. J. Nat Moore, Jr., operated a large hardware and furniture store in Athens, Tennessee. He did business under the trade name of J. Nat Moore & Son. On December 27, 1959, his storehouse burned to the ground, consuming all the contents.

At that time, Mr. Moore held a fire insurance policy with the New Amsterdam Casualty Insurance Company (hereafter New Amsterdam) for protection on the building in the sum of $40,000, and a like policy with the Continental Insurance Company (hereafter Continental) in the sum of $40,000. He also held a fire insurance policy with the Federal Insurance Company (hereafter Federal) upon the personal property within the building in the sum of $42,000.

The agent for these insurance companies, General Adjustment Bureau, Inc., made an investigation of the loss as to property and contents. The investigation resulted in an agreement made on April 27, 1960, that the loss on the building was $63,720 and the loss of the contents in the building was $52,477.01.

Formerly Mr. Moore had his fire insurance with the Dodson Insurance Agency of Athens, Tennessee. A year or so before the expiration of the Dodson policies, Mr. Moore became acquainted with Mr. H. G. Roberts, who was the agent for the Federated Mutual Implement and Hardware Insurance Company (called in the record and hereafter Federated Mutual). As the friendship ripened Mr. Roberts solicited Mr. Moore to place his fire insurance with his company. When the Dodson policies expired, Mr. Moore placed his insurance with Federated Mutual through Mr. Roberts.

For reasons that are disputed, but are immaterial, there developed a desire to cancel the policies in Federated Mutual. Mr. Roberts represented to Mr. Moore that he was going to become an employee of the Crum Insurance Agency (hereafter Crum) at Maryville, Tennessee, that Crum represented several good companies, and that new insurance could be there obtained. Mr. Moore acceded to canceling Federated Mutual and to take the new policies from Crum. By virtue of this understanding the policies in the Federated Mutual were canceled and a refund received. New policies were written by Crum in New Amsterdam, Continental and Federal in the amounts heretofore stated. These policies were dated July 15, 1959. Mr. Roberts personally delivered the policies to Mr. Moore. The first year's premium was to be paid on the installment plan. Mr. Roberts claims that Mr. Moore told him, at the time he wrote the Federated Mutual policies and later, to "keep me covered". Mr. Moore does not directly deny using these words, but states that he takes care of his own business, including fire insurance. (Later will appear details on the question of agency.)

Mr. Roberts did not become an employee of Crum under a written contract whereby he was to receive a salary and commission because Federated Mutual would not let him out of his contract. By oral arrangements Mr. Roberts did work for Crum, writing insurance on a commission basis, and under these circumstances wrote the policies in New Amsterdam, Continental and Federal. While Mr. Roberts (Crum also) claimed that he was a broker, the facts clearly reflect that he was an insurance agent and in any event whether employee or broker, he was not a licensed broker under Tennessee law. Crum was an in-

surance agent. See Title 56, chapters 7, 9, and 10 in volume 10, Tennessee Code Annotated.

A relatively short time after delivery of the policies of New Amsterdam, Continental and Federal, Continental notified Crum that the risk was not too desirable and suggested cancellation or reduction of its policy with Mr. Moore. Thereupon Crum canceled $20,000 of the Continental policy, leaving $20,000 insurance in effect. Then Crum took upon itself, without any notice from its principal, to cancel the New Amsterdam policy in toto as claimed by New Amsterdam's answer, or as Mr. Goddard, Crum's president, says, it was the intention to cancel the New Amsterdam policy, but since the Jack Norman Creswell, d/b/a Underwriters at Lloyd's, London (hereafter Lloyd's) policy had not arrived, the New Amsterdam policy was never canceled or modified. On this latter theory New Amsterdam claims the right of pro rata settlement. Likewise Crum, without request from its principal, canceled out $37,000 of the insurance issued by Federal and reduced the amount of the Federal obligation to $5,000.

Before or somewhat current with the action of the change in the policies of New Amsterdam, Continental and Federal, Crum had arranged insurance on the building in the sum of $60,000 with Lloyd's and on the contents obtained $35,000 insurance with Transit Insurance Company (hereafter Transit). The Lloyd's policy or certificate was dated December 15, 1959 and Transit dated December 17, 1959. The Lloyd's and Transit policies were never delivered to Mr. Moore and he knew nothing about them until about five months after the fire.

On May 20, 1960, Mr. Moore instituted suit against New Amsterdam, Continental and Federal, setting out that the three policies issued by these insurance companies were in effect on the day of the fire and that he was entitled to recover on the basis of the agreed amount of losses, to wit: From Federal the full recovery of $42,000 ($52,477.01 personal property loss) and from Continental and New Amsterdam each one-half of the real property loss, in the total sum of $63,720.

Later Mr. Moore, without receding from his position in the original complaint and in order to have a settlement as soon as possible, added Lloyd's and Transit as defendants and in the alternative sought judgment against all five insurance companies. Incidentally, there was an amendment showing that a Mr. James P. Cartwright was the mortgagee of the real property and entitled to have his interest first paid out of the recovery and an intervening petition filed by Belknap Hardware and Manufacturing Company, a creditor, who sought liquidation of its debt out of any judgment.

The answers of New Amsterdam, Continental and Federal admit that Mr. Moore had the policies as claimed on the date of the fire and admit that the amount of the losses had been agreed upon but each deny full liability—New Amsterdam denying liability at all and Continental and Federal denying liability, except in the reduced amounts, to wit: Federal for $5,000 and Continental for $20,000. In the alternative these defendants make averments that all five policies were effective and settlements should be made pro rata with Lloyd's and Transit in accord with the reduced value or original face value. To the amended complaint bringing in Lloyd's and Transit, they made answers denying liability primarily on the ground that no contract set up as the policies were not secured or accepted by Mr. Moore.

The five insurance company defendants have all interposed motions for summary judgment and the plaintiff, by agreement at the time of the argument on the motions, orally made a motion for summary judgment. Briefs have been submitted and the questions considered.

The basis for determining the motions is the whole record, including depositions, exhibits and affidavits.

1. Fundamental principles of law that have been long recognized as righteous rules are always safe guides for use in decisions.

A fire insurance policy is a contract between the insurer and the insured. In a valid contract there must be a "meeting of the minds" of the contracting parties at the time of its execution or by acquiescence or adoption, which is a subsequent "meeting of the minds". To be sure, there can be a contract binding on a principal made by an agent.

The policies with Lloyd's and Transit can only be valid if Mr. Roberts (or Crum) was the agent of Mr. Moore for the purpose of canceling, in whole or in part, the policies of New Amsterdam, Continental and Federal and securing policies in Lloyd's and Transit.

As heretofore pointed out, Mr. Roberts was not a licensed fire insurance broker under Tennessee law and neither was Crum. In no event can an agent's license include ("supersede") a broker's license. See Tennessee statutes supra, especially Sections 56–1002 and 56–1008, T.C.A.; Cheek v. American Eagle Fire Ins. Co., 6 Tenn.App. 632, 634, 637.

Mr. Roberts was the soliciting agent for himself, or for Crum, and Tennessee law applies to these Tennessee insurance contracts. Therefore, the following Tennessee statute is controlling:

§ 56–705. "Solicitors are agents of the insurer—Licensed fire insurance brokers excepted.—Any person who shall solicit an application for insurance shall in all matters relating to such application and the policy issued in consequence thereof be regarded as an agent of the company issuing the policy, and not the agent of the insured, and all provisions in the application and policy to the contrary are void and of no effect whatever; but this section shall not apply to licensed fire insurance brokers." Volume 10, Tennessee Code Annotated.

Mr. Roberts was the "person" who solicited the application for insurance with New Amsterdam, Continental and Federal and thereby became their agent "in all matters" reating to the policies and not the agent of Mr. Moore. The solicitation by Mr. Roberts being on behalf of Crum, Crum became the agent of New Amsterdam, Continental and Federal and not the agent of Mr. Moore. There is no difference on the agency question as to whether Mr. Roberts was acting as an unlicensed broker [1] or on behalf of Crum. He was the person who solicited the application for the insurance and the statute only excepts *licensed* fire insurance brokers.

The situation here cannot be an exception to the statute. The only exception found in Tennessee decisions is "that where it is 'plainly indicated' that there is fraud and conspiracy between the insured and the Company agent, and that the agent will not reveal the true facts to his principal, no recovery on the policy will be permitted." Beasley v. Nat. Life Ins. Co., 190 Tenn. 227, 229 S.W.2d 146; also see DeFord v. National Life & Accident Ins. Co., 182 Tenn. 255, 185 S.W.2d 617.

It is claimed that the case of Tomei v. Fire & Marine Ins. Co., 4 Tenn.App. 268, is the only Tennessee case reflecting on the present situation. The Tomei decision was based on unusual facts, did not consider the above-quoted statute nor cite authority. Even if the authority of the Tomei case could have fit this case, it was very definitely overruled by the decision in Cheek v. American Eagle Fire Ins. Co., 6 Tenn.App. 632, where this statute was considered.

In the Cheek case, the facts made the soliciting agent the agent of the insured; but the Court said that this statute made him the agent of the insurer whereby payment of premium to him was payment to the insurer and notice of cancellation to him was not effective to terminate the insurance. The well reasoned opinion in the Cheek case is ample authority for the decision here made.

The facts in this controversy present a classic example of the wholesomeness of this Tennessee law.

---

1. In violation of Tennessee criminal statute, Section 56–1008, T.C.A.

Mr. Moore was delayed for an unreasonable time by New Amsterdam, Continental and Federal, as he did not receive his money for some fourteen months after the fire. He was under pressure to pay his creditors and gain a livelihood by resuming his business. If the new arrangements had not been attempted, Mr. Moore would have gotten his insurance money in about two months after the fire, but, instead, he eventually had to hire lawyers and bring suit.

■ Obviously the Tennessee Legislature, by this special statute, intended to protect people who buy insurance through agents. Most always people deal with agents and not the insurance companies direct. Therefore, anyone buying insurance through an agent should be able to rely upon the words and acts of such agent as being the words and acts of the insurance company. Such is the law in Tennessee.

■ Under the mandate of this Tennessee statute, neither Mr. Roberts nor Crum represented Mr. Moore in undertaking to cancel in whole or in part or reduce the policies of New Amsterdam, Continental and Federal and accept in lieu of the cancellations or reductions the policies of Lloyd's and Transit. Hence no contracts were made between Mr. Moore and Lloyd's and Transit. There being no contracts, there is no right of recovery in any respect against Lloyd's and Transit.

■ 2. Under the undisputed facts, the Tennessee law is definite authority for the decision herein made. However, it could be added that even if Mr. Roberts (and Crum) became the agent of Mr. Moore for the purposes of the new arrangements, the new arrangements would not comply with Mr. Moore's request to "keep me covered". The new arrangements attempted by Mr. Roberts, through Crum, fell $2,000 short of the original coverage and it could not have been within the scope of the agency to reduce the coverage.

But New Amsterdam, Continental and Federal, particularly New Amsterdam and Continental, claim that this $2,000 reduction of the Federal policy should not affect the rights of New Amsterdam and Continental. While this appears plausible, actually the alleged agency set up by the statement "keep me covered" was a unitary authorization and the failure in one would be a failure in all.

This proposition is secondary athough it is meritorious.

■ 3. New Amsterdam, Continental and Federal advance the equitable claim that as the policies of Lloyd's and Transit did issue there should be a pro rata payment of the insurance between them and Lloyd's and Transit. To sustain this contention several cases were cited. An attentive study of these cases reflect that all decisions were made upon the idea that all policies in the litigations constituted contracts. No court would require an insurance company to pay an insured where no policy contract existed. In the cases cited, no state statutes were involved.

4. While the above conclusions, particularly the one based on the statute are believed to be solid, it seems expedient to make inquiry as to whether the proof is undisputed on the determinative question of agency.

In one of the briefs submitted by the attorneys for New Amsterdam, Continental and Federal, the following statement is made:

"All parties to the action now have moved for summary judgments. There may be some controversy as to several material facts. Such controversies, however, perhaps are more in the nature of the conclusions or inferences to be drawn from the bare facts, the latter not being fundamentally in dispute. In any event, it apparently is considered by all parties that the matter appropriately is one for summary judgment by the Court."

■ If different reasonable conclusions may be drawn from undisputed material facts a case would not be proper for a summary judgment but should go

to a trier of facts. But if only one reasonable conclusion may be drawn from undisputed facts, a summary judgment may be rendered.

■ The proof on the agency question is as follows:

*Mrs. Ruth D. Eaves' Affidavit*

Mrs. Ruth D. Eaves, bookkeeper for Mr. Moore, said "that when the new policies or memoranda of policies were delivered and the Federated policy picked up by Mr. Roberts, Mr. Moore told Mr. Roberts to keep him covered with fire insurance."

*Proof by Mr. Moore*

"Q. It is true, is it not, or is it true that you turned over your insurance matters to him (Mr. Roberts)? A. No, sir * * *" Deposition, page 4, lines 13–15.

In listening on an extension phone to a conversation between one of Mr. Moore's attorneys and the Crum Agency, as follows:

"So he (Crum employee) says, 'Well, don't you know there's two more companies involved?'

"So I was on the extension. I said 'Who in the devil give them the authority to do it? I didn't know anything about it.'" Deposition, page 24, lines 2–6.

In talking about the change from the Federated Mutual policy to New Amsterdam, Continental and Federal, Mr. Moore testified:

"Q. So you just left it up to him to re-insure you? A. No, sir." Deposition, page 11, lines 15–16.

*Proof by Mr. Roberts*

"A. Because he had told me earlier, after he had agreed to give me the business back in April, I believe it was April, he wanted verification, he wanted assurance that he was covered. He said, 'You keep me covered for these amounts that I have given for the building and the contents and you keep me covered.'" Deposition, page 9, lines 7–12.

"Q. And said for you to keep him covered? A. Right, that he felt that he needed that much coverage and to be sure not to let it lapse or go out of benefit and when any payment was due to see that it got in." Deposition, pages 9–10, lines 23, 24, 25 and 1.

Mr. Roberts telling Mr. Goddard of Crum that "* * * he (Mr. Moore) had told me that in all events to keep him covered or that he must have insurance to keep him covered so long as the companies were reputable, it made no great deal of particular—not a great deal of difference to him as to who they were as long as they were reputable and doing business in Tennessee * * *" Deposition, page 11, lines 4–9.

(This statement is incompetent as Mr. Moore was not present.)

"Q. Now, then after the fire occurred, did you contact Mr. Moore any more thereafter? A. I called Mr. Moore, oh, I was in Athens, I drove to Athens, either on Monday or Tuesday (after the fire) on other business as well and I called Mr. Moore on the phone and talked to him on the phone.

"Q. And what was the nature of that conversation? A. I just wanted to call him, just simply a courtesy call, I suppose you would call it.

"Q. You didn't take up anything concerning these new policies with him at that time? A. No.

"Q. Did you ever take up with him the matter of these new policies that had been contemplated early in December of 1959? A. We did discuss it at a later date, in fact, the only time actually since the fire that I have talked to Mr. Moore personally, I ran into him at a restaurant.

"Q. Do you remember about what the date of that was? A. Must have been along in August some time.

"Q. 1960? A. 1960.

"Q. You knew at that time that Mr. Moore had a suit pending here

948

in federal court? A. Yes, I had heard that.

"Q. And you had a discussion with him there? A. Yes, we did discuss the fact that there *was to have been a change* made in his insurance program insofar as the two properties discussed or destroyed were concerned. (Emphasis added.)

"Q. Did Mr. Moore express surprise that there was to be such a change? A. No, not that I could say, really.

"Q. You just told him then what you had talked over with Mr. Goddard back in December and what you had in mind? A. Um-hum.

"Q. And what was being done when the fire occurred, you just told him the facts as you knew them? A. Right.

"Q. At that conversation in August of 1960? A. Right." Deposition, pages 14, 15 and 16, lines 19 through 8.

"A. Through the Crum Agency. I was acting in this matter as Jack Moore's agent and broker through Crum Agency." Deposition, page 16, lines 18–19.

(This is not competent because belief of a person that he is authorized does not constitute proof of agency.)

"Q. You didn't know when you delivered those three policies to him as to whether he would accept them or not, did you? A. No, sir, I didn't, I couldn't swear that he would become—

"Q. (Interposing) You thought he would? A. He may have had a change of heart.

"Q. And so it was on the basis of the fact that he once had agreed upon a change that you assumed that he would agree on another change in December of 1959, that is just about it, isn't it? A. Well, to some degree, to some degree.

"Q. Well, what else, if there is anything else that made you think it? A. Well, the fact that he had told me to 'Keep me covered.' He said, 'You keep me covered.'" Deposition, page 17, lines 7–22.

"Q. (By Mr. Osborne) Your only instruction from J. Nat Moore, if you can call it that, or request from him, really, was to keep him covered to certain extents? A. (Witness moves head up and down.)

"Q. Right? A. True, that is right." Deposition, page 42, lines 19–24.

"Q. So in taking any policy out to him he would not have been bound to accept it, would have a perfect right to say, 'No, I don't want it in some other company.'? A. Certainly he would have that right, just as any other individual would have." Deposition, page 43, lines 14–18.

*Affidavit of Mr. Roberts*

This affidavit was taken May 23, 1961, and contains:

"My next contact with Mr. Moore occurred in June, 1960. I saw Mr. Moore in a restaurant in Athens, Tennessee and, since there had been considerable discussion of the basis upon which I had been acting for Mr. Moore in the foregoing insurance matters, I asked him to give me a statement setting out the real facts as to the authority I had from him. Mr. Moore said that he would like to give me such a statement but would have to check the matter with his attorney. We went from the restaurant to Mr. Moore's home in Athens. While he was placing a telephone call to his attorneys in Chattanooga, sitting in living room, I typed a statement, dated June 7, 1960, containing the true facts as true, the relationship between Mr. Moore and me concerning his insurance and the instructions and authorities he had given to me about this insurance, copy of which is at-

tached as Exhibit 2. This was about lunch time and his attorneys had not returned to their office. I finished typing the statement and showed it to Mr. Moore. He agreed that what I had typed in the statement was true, but repeated that he would have to get the approval of his attorneys before signing the statement. After about an hour, he got one of his attorneys on the telephone and read the statement to the attorney. I could not hear what the attorney replied but Mr. Moore told me that he was sorry but that the attorney had told him not to sign any statement but that I could send it to the attorney if I wanted him to consider it. Since Mr. Moore had said to me that what is in the statement is true, I did not bother to send it to the attorney."

"Exhibit 2" to the affidavit is as follows:

"Athens, Tennessee
"June 7, 1960

"To Whom It May Concern:

"My name is J. Nat (Jack) Moore, Jr. I reside on Pine Street in Athens, Tennessee. I owned and operated a retail hardware and furniture store located on South Jackson Street, in Athens, Tennessee, known as J. Nat Moore and Son. More than a year ago I turned over the problem of placing my fire insurance to Mr. H. G. Roberts, P. O. Box 269, Maryville, Tennessee. Mr. Roberts had the privelege [sic] of placing the coverage at his own discretion, so long as the companies were reputable and sound financially.

"I have read the above statement and it is true.

"Signed _____
"Witness _____"

From the competent evidence Mr. Roberts is sometimes found claiming to have full authority as the agent of Mr. Moore in the placing of his insurance and at other times saying that Mr. Moore had the right to reject any new policies that might be written.

Mr. Roberts did not reveal to Mr. Moore the new arrangements when he called him by telephone a day or two after the fire. When Mr. Roberts' deposition was taken on January 9, 1961, he said nothing about having drafted a statement on June 7, 1960, for Mr. Moore to sign, as he asserts in his affidavit of May 23, 1961, but said he told Mr. Moore that "there was to have been a change."

Mr. Roberts said in his deposition he had only seen Mr. Moore once since the fire, when he ran into him in a restaurant in Athens in August 1960. As he saw him only once from the time of the fire to the time of the deposition, this must have been June 7, 1960, the date of the unsigned written statement, instead of August.

It is quite significant that Mr. Roberts did draw up a written statement for Mr. Moore to sign stating that Mr. Roberts had full authority as Mr. Moore's agent during the crucial period. If Mr. Roberts was Mr. Moore's agent, with authority to change insurance, he stood in a fiduciary relationship. If there were such relationship, it is not reasonable to believe that Mr. Roberts would have told Mr. Moore immediately after the fire about the change in the insurance policies instead of waiting more than five months.

From the whole proof the one reasonable conclusion is reached that whatever was said concerning "keep me covered" was intended to apply to payment of installments on the premiums, as Mr. Moore did not want to default and lose his insurance.

The contradictory and shadowy proof concerning the agency of Mr. Roberts wholly fails to show that he had the right to cancel, reduce or change the insurance issued by New Amsterdam, Continental and Federal.

The picture flashes with clearness that Mr. Roberts did not consider himself to be the agent of Mr. Moore for the pur-

poses of changing his insurance until about the time of or after the litigation began. It is to be noted that service was had on New Amsterdam, Continental and Federal on May 31, 1960, and that on June 7, 1960, Mr. Roberts "ran into" Mr. Moore in a restaurant in Athens, told him about the change in his insurance, and went home with him to prepare the written statement. The afterthought of agency has no stability.

Upon the bare facts the one conclusion is reached that neither Mr. Roberts nor Crum was the agent of Mr. Moore for the purpose of the attempted changes in the policies of New Amsterdam, Continental and Federal and the securing of the Lloyd's and Transit policies.

Reiterating, it is fundamental that Lloyd's and Transit should not have to pay or participate in payment when it is clear that Mr. Moore did not take out policies with them.

5. The plaintiff claims a penalty on a charge of bad faith on the part of New Amsterdam, Continental and Federal as provided by § 56–1105, Tennessee Code Annotated.

This provision of Tennessee law requires a formal demand for the payment of the insurance as a condition precedent to a claim of bad faith. St. Paul Fire & Marine Ins. Co. v. Kirkpatrick, 129 Tenn. 55, 164 S.W. 1186; De Rosset Hat Co. v. London Lancashire Fire Ins. Co., 134 Tenn. 199, 183 S.W. 720. The record does not disclose a clear formal demand made by Mr. Moore for the payments before the institution of this suit. Perhaps the implications from the proof show that a demand was made, but even so, the proof is not sufficient to charge New Amsterdam, Continental and Federal with bad faith. It is true that there was a delay in payment and also true that Mr. Moore was not timely informed about the new arrangements as being the reason therefor. It is considered, however, that New Amsterdam, Continental and Federal had sufficient grounds to honestly believe that Lloyd's and Transit should bear part of the burden. A penalty, under this statute, should not be given against an insurance company unless its conduct involved moral turpitude. The situation does not warrant the award of a penalty. McClish v. Fire Ins. Co., 2 Tenn.App. 560.

However, the delay is sufficient to justify the payment of interest, and interest on the recoveries will commence sixty days after the date of the fire, this being a reasonable time for settlement.

For the reasons set forth above:

The motions for summary judgment made by Lloyd's and Transit are sustained.

The motions of New Amsterdam, Continental and Federal are denied, except as to the claim for a penalty, and to this extent the motions are sustained.

The motion of the plaintiff is sustained and the recovery will be for the amount sued for, including interest at the rate of six per cent per annum, on each award from February 27, 1960 to February 20, 1961, the date the money was paid to the plaintiff, except the motion is denied on the claim for penalty.

In the judgment there will be proper recognition of the claim of Mr. James P. Cartwright, the mortgagee, and the claim of Belknap Hardware and Manufacturing Company, a creditor.